BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
BRITTANY N. DEJONG (258766)
dejong@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:   619/239-4599
Facsimile: 619/234-4599

JANINE L. POLLACK (*pro hac vice* pending)
pollack@whafh.com
MICHAEL JAFFE (133332)
jaffe@whafh.com
GLORIA KUI MELWANI (*pro hac vice* pending)
melwani@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:   212/545-4653

[additional counsel on signature page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

DUANE ROBERT GREENE, SHAWN RANDALL THOMAS, JAMES HIRTZEL, ANTHONY SWETALA, and DR. SPRAGUE SIMONDS on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FIVE PAWNS, INC.,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 8:15-cv-01859-DOC-DFM

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF: (1) CAL. CONSUMERS LEGAL REMEDIES ACT; (2) CAL. UNFAIR COMPETITION LAW; (3) CALIFORNIA FALSE ADVERTISING LAW; (4) INDIANA DECEPTIVE CONSUMER SALES ACT; (5) N.Y. GEN. BUS. LAW; (6) VERMONT CONSUMER PROTECTION ACT; (7) BREACH OF EXPRESS WARRANTY**

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

Plaintiffs Duane Robert Greene ("Plaintiff Greene"), Shawn Randall Thomas ("Plaintiff Thomas"), James Hirtzel ("Plaintiff Hirtzel"), Anthony Swetala ("Plaintiff Swetala"), and Dr. Sprague Simonds ("Plaintiff Simonds") (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this action on behalf of themselves and all others similarly situated, and the general public, based upon personal knowledge as to themselves and their activities, and on information and belief as to all other matters, against defendant, Five Pawns, Inc. ("Five Pawns" or "Defendant"), and allege as follows:

## JURISDICTION AND VENUE

1.     Diversity subject matter jurisdiction exists over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005), amending 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions involving: (a) 100 or more members in the proposed class; (b) where at least some members of the proposed class have different citizenship from some defendants; and (c) where the claims of the proposed class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. 28 U.S.C. §§ 1332(d)(2) and (6).

2.     While the exact number of members in each of the proposed classes is unknown at this time, Plaintiffs have reason to believe that thousands of consumers purchased Defendant's vapor liquids ("e-liquids") for electronic cigarettes (or "e-cigarettes")[1] throughout California, Indiana, New York, and Vermont during the relevant period.   The number of class members could be discerned from the records maintained by Defendant.

3.     While the exact damages to Plaintiffs and the members of the classes are unknown at this time, Plaintiffs reasonably believe that their claims exceed five

---

[1]     E-liquids are sometimes used in devices called personal vaporizers, which are products that include, but are not synonymous to, electronic cigarettes.

million dollars ($5,000,000) in the aggregate.

4. Jurisdiction over the New York, Indiana, and Vermont Plaintiffs is proper pursuant to 28 U.S.C. § 1367, which provides, in relevant part, that: (a) "in any action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution . . . includ[ing] claims that involve the joinder . . . of additional parties."

5. This Court has personal jurisdiction over Defendant because Defendant is a resident of the State of California and has purposefully availed itself of the privilege of conducting business in the State of California.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District and because Defendant:

       a. has intentionally availed itself of the laws and markets within this District through the promotion, marketing, distribution and sale of its products in this District;

       b. does substantial business in this District, including maintaining its principal place of business in this district; and

       c. is subject to personal jurisdiction in this District.

7. Venue is proper in this Court as to the New York, Indiana, and Vermont Plaintiffs and Claims under the doctrine of pendant venue.

## NATURE OF THE ACTION

8. Defendant is a manufacturer of e-liquids, which are used in electronic cigarettes. Defendant's e-liquids contain hazardous substances known as diacetyl ("DA") and acetyl propionyl ("AP") (also known as 2,3-pentanedione), in addition to propylene glycol, glycerin, nicotine, and flavorings. As detailed herein, the DA

and AP levels detected for certain particular flavors of Defendant's e-liquids represent the highest concentration that has ever been seen in any e-liquid. Some e-liquids manufactured by other companies are sold *without* DA and AP, propylene glycol, nicotine, or flavors, as it is possible to source ingredients that do not contain these toxic ingredients.[2]

9.    DA and AP are compounds of diketone and are responsible for the buttery and creamy taste of many foods and beverages, most famously, popcorn. While DA and AP are safe to eat or drink, inhalation is known to cause certain lung conditions, including Bronchiolitis Obliterans, a condition in which irreversible scarring to the lungs is produced, in serious cases requiring lung-transplants. A number of cases of Bronchiolitis Obliterans in popcorn factory workers exposed to DA and/or AP led authorities to create very strict limits on the amount of these chemicals that workers may be exposed to. Similar cases of Bronchiolitis Obliterans have since been discovered in workers in other types of manufacturing plants.

10.   It is also known that DA and/or AP are contributing factors to both chronic obstructive pulmonary disease ("COPD") and emphysema.[3]

11.   Defendant does not warn its customers about the dangers of inhaling DA and AP, neither on its product packaging nor on its website. Instead, Defendant's marketing campaign describes its e-liquids as if it were selling wine. For example, the Company describes its "Bowden's Mate" e-liquid as "crisp mint

---

[2]    For example, Virgin Vapor, Halo Cigs, Fireband, and Mt. Baker Vapor all produce e-liquids that are DA and AP free. Five Pawns also recently began selling a DA and AP free flavor of e-liquid called Symmetry Six.

[3]    S. Costigan, C. Meredith, *An Approach To Ingredient Screening And Toxicological Risk Assessment of Flavours in E-Liquids*, 72 REG. TOX. AND PHARM. 361 (July 2015).

with subtle chocolate undertones and a French vanilla finish," while its "Absolute Pin" e-liquid has an "intense complexity of Irish cream, cinnamon spice, and caramel with subtle absinthe undertones." Some special edition flavors in its line of products are described as having been aged in oak barrels.

12. Despite Defendant's marketing campaign that boasts its "top-notch" ingredients" that makes for a "high-end experience," Defendant's products are actually laden with harmful chemicals.

13. Sometime in 2009, users of electronic cigarettes began to become aware of the presence of DA and AP in e-liquids and that those substances pose serious health hazards, particularly health hazards associated with respiratory diseases. Some e-liquid manufacturers took the issue seriously enough to make efforts to halt usage of flavorings that contain DA and/or AP in their e-liquids. *See* ¶ 8 n.2, *supra*.

14. From the Company's inception in November 2012, it has manufactured and sold high-end e-liquids in a variety of flavors, all containing various amounts of DA and AP, depending on the flavor. While Defendant claimed on its website that it "moved to source solely diacetyl-free ingredients," it subsequently discovered that "trace amounts of diacetyl" were found in its products.  A number of tests done on Defendant's e-liquids, including one performed by a laboratory retained by Defendant in September 2014, show that Defendant's e-liquids contain DA and AP, some at substantially more than trace amounts,[4] thus directly contradicting its claim that its e-liquids contain diacetyl-free flavorings.

15. Defendant did not disclose these results until June 2015, and it did so at that time only in an attempt to rebut the testing that had been conducted by an e-cigarette store in England called Cloud 9 Vaping ("Cloud9"). The Cloud9 test

---

[4]      Trace amounts of DA and/or AP are amounts lower than 5 μg/ml.

- 4 -

results showed that some of Defendant's line of products contain the highest levels of AP that have ever been shown in a laboratory test of e-liquids. In light of these test results, Cloud9 proceeded to withdraw the entire line of Five Pawns products from its inventory. Shortly thereafter, the Electronic Cigarette Trade Association of Canada ("ECTA") notified Canadian vendors of e-liquids to withdraw and cease sales of Defendant's e-liquids.

16. Defendant's e-liquids also contain varying levels of nicotine (in 0mg, 3mg, 6mg, 12mg, and 18 mg levels). The Cloud9 laboratory testing has also shown that Defendant disclosed inaccurate nicotine levels on its packaging.

17. Defendant has employed numerous methods to convey to consumers throughout the United States its deceptive, false and misleading message about its e-liquids, including its packaging, product inserts, communications with its customers via e-mail or internet forums, and its website through which it sells its products directly to the public, https://fivepawns.com/blog/html (last visited August 17, 2015).

18. As a result of Defendant's deceptive, false and misleading claims in its advertising, consumers – including Plaintiffs and the other members of the proposed classes – have purchased Defendant's e-liquids without being advised that they contain a variety of toxins, impurities, and related potential health hazards as found by various studies discussed in more detail below. Had Defendant disclosed these material facts, Plaintiffs would not have purchased Defendant's e-liquids. Defendant was able to charge more than what its e-liquids would have been worth had it disclosed the truth about them. In fact, Defendant charges one of the highest prices for e-liquids in the e-liquid industry, at $27.50 for each 30ml bottle of juice and $37.50 for its limited edition Castle Long Reserve.

19. Plaintiffs bring this class and private attorney general action against Defendant, on behalf of themselves, the proposed classes, and the general public,

in order to: (a) halt the dissemination of Defendant's deceptive advertising message; (b) correct the false and misleading perception Defendant has created in the minds of consumers through its representations and omissions; and (c) secure redress for consumers who have purchased one or more of Defendant's e-liquids. Plaintiffs, on behalf of themselves and the proposed classes, allege violations of California Business & Professions Code §§ 17200, *et seq.* ("UCL"), the Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.* ("CLRA"), breach of express warranty, breach of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5 *et seq.*,  violations of the New York General Business Law § 349 ("GBL"), and violations of the Vermont Consumer Protection Act (formerly known as the Consumer Fraud Act), 9 V.S.A. § 2451a et seq. ("VCPA").

## PARTIES

*Plaintiffs*

20.  Plaintiff Greene is an individual who resides in Indianapolis, Indiana and who is a citizen of Indiana.

21.  Plaintiff Thomas is an individual who resides in Kings County and is a citizen of New York.

22.  Plaintiff Hirtzel is an individual who resides in Sacramento, California and is a citizen of California.

23.  Plaintiff Swetala is an individual who resides in Tulare, California and is a citizen of California.

24.  Plaintiff Simonds is an individual who resides in Burlington, Vermont and is a citizen of Vermont.

25.  Members of the putative classes reside in California, Indiana, New York, Vermont and other states in the United States.

26.  During the relevant period, Plaintiffs, while in the states of Indiana, New York, California, and Vermont were exposed to and saw Defendant's

material, deceptive marketing claims and packaging.  Plaintiffs, relying on Defendant's misleading marketing and labeling of Defendant's products, believed that Defendant's products did not carry dangers or risks associated with DA and/or AP.  While in the states of Indiana, New York, California, and Vermont, Plaintiffs purchased Defendant's e-liquids either at local retailers and online.  Had Defendant disclosed that its e-liquids contain a variety of toxins, impurities, and related potential health hazard, as was known to or should have been known to Defendant, and has been found by various studies discussed in more detail below, Plaintiffs would not have paid the price that they paid Defendant's e-liquids or would not have purchased Defendant's e-liquids. Thus, as a result of Defendant's material deceptive claims and omissions, Plaintiffs suffered injury in fact and lost money.

27.  Plaintiff Greene purchased Defendant's e-liquids at a local store in Indianapolis, Indiana and on the Internet on the Five Pawns e-commerce store and on another online store called Giant Vapes in or about May 2014.  He purchased three varieties of Five Pawns Kings e-liquids – Castle Long with 24mg Nicotine Strength, Fifth Rank with 24mg Nicotine Strength, and Gambit at 24mg Nicotine Strength.  He thereafter intermittently purchased additional Five Pawns e-liquids.  In total, he purchased approximately seven 30-ml bottles of Five Pawns e-liquid and has paid the retail market price for each bottle, which was, upon information and belief, $27.50 at all relevant times.   He ceased purchasing Defendant's products when the Cloud9 test results were posted on the Internet.

28.  Plaintiff Thomas purchased Defendant's e-liquids at a store called Beyond Vape in New York County, New York in or around March 2015. He paid the retail market price for his purchases.  He ceased purchasing Defendant's products when the Cloud9 test results were posted on the Internet.

29.  Plaintiff Hirtzel purchased Defendant's e-liquids at a store called Planet of the Vapes in Sacramento County, Carmichael, California in November 2013. He

purchased one bottle of Five Pawns Castle Long Reserve with 12mg Nicotine Strength for $37.50. He thereafter intermittently purchased additional Five Pawns e-liquids in various flavors, for which he paid the retail market price of between $27.50 and $37.50 for each 30ml bottle. He ceased purchasing Defendant's products when the Cloud9 test results were posted on the Internet.

30.   Plaintiff Swetala purchased at least three bottles of Defendant's e-liquids at a store called Visalia Vapes in Visalia, California in or around January 2015. He paid the retail market price for each bottle he purchased.

31.   Plaintiff Simonds purchased approximately seven bottles of Five Pawns e-liquids online in or around August through October 2015. He also purchased Defendant's e-liquids in a store called Old Port Vape in Portland, Maine. He paid the retail price for each bottle he purchased.

**_Defendant_**

32.   Five Pawns is incorporated in California, and has its corporate headquarters at 17145 Von Karman Avenue, Suite 105, Irvine, California 92614. Defendant carries premium, "handcrafted," artisan-style e-liquid that is mainly sold in high-end, boutique vape shops. Defendant currently offers two separate e-juice lines, the Mixology Edition and Signature Series, each consisting of five unique and complex flavor choices. The company appears to be following the lead of the beer and liquor industries, branding itself as a sort of microbrewery, or craft distiller of e-liquid.

33. Launched in November 2012, Defendant's products are sold in hundreds of retail locations in the United States. Defendant's products are also sold in 43 other countries.

34. Plaintiffs allege, on information and belief, that at all times herein, Defendant's agents, employees, representatives, executives, directors, partners, and/or subsidiaries were acting within the course and scope of such agency,

employment, and representation, on behalf of Defendant.

**FACTUAL ALLEGATIONS**

## I.     E-LIQUIDS AND ELECTRONIC CIGARETTES

35.   This action concerns e-liquids sold by Defendant.

36.   An electronic cigarette, or e-cigarette, is a device that is an alternative to tobacco smoking.  E-cigarettes are designed to deliver a smoking-like "hit" of e-liquid vapor, usually containing nicotine, which is inhaled by the user.  They work through the use of a battery operated heating mechanism, which typically converts the e-liquid that may contain DA, AP, glycerin, glycol, natural and artificial flavors and, in most electronic cigarettes, various proportions of nicotine, into vapor. When a person inhales ("vapes") from an e-cigarette, this mimics the taking of a "drag" on a traditional tobacco cigarette. A heating device is activated, the e-liquid is converted into vapor, and the consumer inhales the vapor.

37.   According to a 2011 study by the Centers for Disease Control and Prevention ("CDC"), as of that year, more than one fifth of smokers in the United States had tried electronic cigarettes, and 6% of all adults had tried them.[5]

38.   According to a subsequent study by the CDC, nearly 1.8 million middle and high school students tried e-cigarettes in 2011 and 2012, including approximately 160,000 students who had never used conventional cigarettes.[6] The

---

[5]     Press Release, Centers for Disease Control and Prevention, *About One in Five U.S. Adult Smokers Have Tried an Electronic Cigarette* (Feb. 28, 2013), http://www.cdc.gov/media/releases/2013/p0228_electronic_cigarettes.html    (last visited Nov. 9, 2015).

[6]     Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, *Notes from the Field: Electronic Cigarette Use Among Middle and High School Students — United States, 2011–2012* (Sept. 6, 2013), http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6235a6.htm (last visited Nov. 10, 2015).

study also found that the number of U.S. middle and high school student e-smokers doubled between 2011 and 2012.[7]

39.   According to analysts, sales of e-cigarettes in America in 2012 were between $300 million and $500 million.[8]   This was approximately double what they were in the preceding year, and sales were projected to double again in 2013.[9]

40.   E-cigarettes and e-liquids are commonly marketed as a "safer" alternative to traditional cigarettes. However, the CDC published a report in 2014 that the number of calls to poison centers involving e-liquids containing nicotine rose from one per month in September 2010 to 215 per month in February 2014. CDC Director Tom Frieden, M.D., M.P.H. commented, "This report raises another red flag about e-cigarettes – *the liquid nicotine used in e-cigarettes can be hazardous*."[10]

41.   A study published in the Environmental Health Perspectives by the Harvard T.H. Chan School of Public Health on December 8, 2015, found at least one flavoring chemical in the airstream or vapor captured in 47 out of 51 types of flavored e-cigarettes or 92% of samples.[11]   The study also detected DA above the

---

[7]    *Id.*

[8]    *E-cigarettes: Vape 'Em if You Got 'Em*, THE ECONOMIST, (Mar. 23, 2013), www.economist.com/news/business/21573985-challenge-big-tobacco-vape-em-if-you-got-em (last visited Nov. 10, 2015).

[9]    *Id.*

[10]    Press Release, Centers for Disease Control and Prevention, New CDC Study Finds Dramatic Increase in E-Cigarette-Related Calls to Poison Centers (Apr. 3, 2014),      http://www.cdc.gov/media/releases/2014/p0403-e-cigarette-poison.html (last visited Nov. 10, 2015) (emphasis added).

[11]    Joseph G. Allen et al., Flavoring Chemicals in E-Cigarettes: Diacetyl, 2,3-Pentanedione, and Acetoin in a Sample of 51 Products, Including Fruit-, Candy-, and Cocktail-Flavored E-Cigarettes, Environmental Health Perspectives 1510185 (Dec. 8, 2015), http://ehp.niehs.nih.gov/15-10185/ (last visited Dec. 12, 2015).

laboratory limit of detection in 39 of the 51 flavors tested and 2,3-pentanedione and acetoin in 23 and 46 of 51 flavors tested, respectively. The study concluded that urgent action is recommended to further evaluate the widespread exposure of these chemicals in flavored e-cigarettes based on the chemicals associations with bronchiolitis obliterans and other severe respiratory diseases, including the disease known as "Popcorn Lung," among workers inhaling heated vapors. The study also noted concern that the flavors may be appealing to youth and that there is no current regulation of e-cigarettes.

42. Aware of the growing popularity and the potential dangers in e-cigarettes, the United States Food and Drug Administration (the "FDA") proposed rules in April 2014 that would require e-cigarettes, including liquid nicotine and devices, to be approved by the agency. The rules would also ban sales to minors and require e-cigarette and e-liquid companies to disclose its ingredients. The rules were expected to be in place by the end of the summer of 2015.

43. Defendant sells what is reportedly premium, high-end e-liquids using "top notch ingredients".[12] Defendant sells its e-liquids at a high premium, because the Company uses "natural ingredients" that are "sourced locally," according to its Chief Executive Officer ("CEO"), Rodney Jerabek.[13]

44. Defendant's e-liquids were introduced to the market with a retail price of $27.50 and have remained that price, except for its limited edition Castle Long Reserve, which sells for $37.50. As of the filing of this Complaint, individual Five Pawns Kings can be purchased at stores across the country including various stores in California, New York and Indiana. Defendant also sells its products on its own website, www.fivepawns.com.

---

[12]    *Five Pawns President Interview*, FIVE PAWNS, (May 31, 2013), http://fivepawns.com/five-pawns-president-interview/ (last visited Nov. 10, 2015).

[13]    *Id.*

45.   Defendant's products are more expensive than those of most of its competitors.   For example, Space Jam, a competitor, offers 15ml bottles for $11.99.[14] Another competitor, Ossington by MOSHI, offers 30ml bottles for $22.00.[15]   Like Five Pawns, both Space Jam and MOSHI market themselves as high-end e-liquid brands using quality ingredients.

46.   On information and belief, most members of the proposed classes have bought more than one of Defendant's products.

## II.   PUBLISHED STUDIES DEMONSTRATE THE DANGERS AND EXPOSURE TO HEALTH RISKS OF E-LIQUIDS

47.   Because of the rapid growth in the use of electronic cigarettes by consumers in recent years, an increasing number of government agencies, research facilities, and e-cigarette/e-liquid retailers have begun to conduct studies concerning the potential health impact and risks of these devices.   These studies have found, *inter alia*, including with respect to Defendant's e-liquids: (a) measurable amounts of DA and/or AP in e-liquids that are, or potentially are, disease-causing, (b) harmful potential side effects of inhaling e-liquids, and (c) that more study is needed to determine the full range of health dangers of inhaling e-liquids.

48.   Recently, on June 28, 2015, a UK e-cigarette and e-liquid seller called Cloud9 hired a laboratory to conduct tests of e-liquids supplied by Defendant as well as other manufacturers for potentially dangerous chemicals. The results showed Five Pawns, along with 2 other brands, had dangerously high numbers of DA and AP, with Five Pawns showing the highest levels Cloud9 had ever seen.

---

[14]   *Space Jam-Starship 1 (15ml),* VAPORDNA, http://www.vapordna.com/Space-Jam-Starship-1-p/sj0009.htm (last visited Nov. 10, 2015).

[15]   *Ossington by MOSHI*, ELIQUID.COM, http://www.eliquid.com/collections/ moshi/products/moshi-ossington (last visited Nov. 10, 2015).

| Brand | Flavour | Diacetyl (ppm) | AP (ppm) | Our Action |
|---|---|---|---|---|
| Suprem-e | Hazelnut | 22 | 33 | withdrawn |
| Suprem-e | Coffee | 105 | 27 | withdrawn |
| Suprem-e | Irish Creem | 17 | 4 | withdrawn |
| Suprem-e | RY4 Pleasure | 217 | 4 | withdrawn |
| Suprem-e | The Pie | 247 | n/d | withdrawn |
| Suprem-e | Vanilla | 0.1 | 43 | withdrawn |
| Mystic | Vanilla Custard V1 | 400 | 200 | withdrawn and reformulated |
| Five Pawns | Absolute Pin | 40 | 2500 | entire range withdrawn |
| Five Pawns | Bowden's Mate | 90 | 2200 | entire range withdrawn |
| Five Pawns | Castle Long | 70 | 900 | entire range withdrawn |
| Five Pawns | Gambit | 40 | 2000 | entire range withdrawn |
| Five Pawns | Grandmaster | 20 | 300 | entire range withdrawn |
| Five Pawns | Lucena | 30 | 340 | entire range withdrawn |
| Five Pawns | Queenside | 100 | 1000 | entire range withdrawn |

ppm = parts per million

n/d = none detected

49.   Defendant sent a cease and desist letter to Cloud9, and Cloud9 removed the test results from its website "pending legal advice."[16]

50.   Notably, the results show that nicotine content varies from 1.8mg to 3.7mg on ostensibly 3mg samples, and much of the propylene glycol and vegetable glycerin ratios do not match with what Defendant lists on the bottles. As a result, Cloud9 immediately stopped selling these products.[17]

51.   As an attempt to conduct damage control, in early July 2015, Defendant released previously unreleased test results on its products that were done in September 2014 by Newport Scientific, Inc., a laboratory Defendant hired.  The tests showed that the products do in fact contain amounts of DA and AP, contrary

---

[16]   *Liquid Test Results*, CREME DE VAPE, http://www.cremedevape.com/Blog/Liquid-test-results (last visited Nov. 11, 2015).

[17]   *Five Pawns Bring Out Legal Big Guns – Cloud 9 Removes Testing Results*, THE GRUMPY VAPER, http://thegrumpyvaper.com/five-pawns-bring-out-legal-big-guns-cloud-9-removes-testing-results/ (last visited Nov. 10, 2015).

to Defendant's representations to the public:

### REPORT OF ANALYSIS

Ten bottles were received on 23 September 2014.  One additional bottle was received on 2 October 2014.  The samples were analyzed for the concentrations of diacetyl and 2,3-pentanedione using gas chromatography with mass spectroscopy (GC-MS).  The results are presented in the table below.

| Sample | Concentration (µg/g) | |
|---|---|---|
| | Diacetyl | 2,3-Pentanedione |
| Grandmaster | TR < 5 | 130 |
| Gambit | TR < 5 | 360 |
| Queenside | TR < 5 | 350 |
| Bowden's Mate | 6.6 | 910 |
| Absolute Pin | TR < 5 | 290 |
| Castle Long | ND < 5 | 80 |
| Lucena | ND < 5 | 74 |
| Sixty-Four | ND < 5 | ND < 5 |
| Perpetual Check | 16.6 | ND < 5 |
| Fifth Rank | ND < 5 | ND < 5 |
| Black Flag Fallen | TR < 5 | 65 |

52.  Specifically, a customer contacted Defendant to inquire if Defendant's products contain DA or AP, and a Five Pawns representative name Annoushka Lyvers replied that "[n]one of our handcrafted flavors use diacetyl or acetone." Another customer asked the same question and received a response from the CEO, who responded: "We use absolutely no Diacetyl or additives of *any kind* in our liquids."[18]

53.  In addition, Russell Wishtart ("Wishtart"), consumer activist, vaping guru, and host of the popular podcast Click, Bang! that is devoted to issues regarding vaping, broadcasted a telephone conversation on its July 1, 2015 episode between Wishtart and a Five Pawns representative. Wishtart telephoned Five Pawns to ask if their e-liquids, specifically, the Absolute Pin and Bowden's Mate flavors, contain AP. The Five Pawns employee answered that the liquids in

---

[18]    *Cloud 9 Removes Five Pawns Testing Results Pending Legal Advice*, VAPEMESTOOPID,    http://vapemestoopid.co/2015/06/cloud-9-removes-five-pawns-testing-legal-advice/ (last visited Nov. 10, 2015).

question contain trace amounts and then clarified that their test results contain ND (not detectable levels of AP). However, Defendant's own test results show that Absolute Pin contains 290 µg/ml of AP and that Bowden's Mate contains 627.7 µg/ml.

54.  Cloud9 had initially asked Defendant to provide its own test results when Cloud9 commenced trading with the Company in the beginning of 2015 but Defendant declined, at a time when Defendant had conducted testing on its products and knew the levels of AP and DA in its products.

55.  The other two e-liquid companies that carry e-liquids containing high levels of DA and/or AP, Suprem-e and Mystic Vapor, both began work on reformulating their products. Mystic Vapor's reformulated version of a particular flavor, Vanilla Custard, recently tested free of both DA and AP.[19]

56.  The National Institute for Occupational Safety and Health ("NIOSH") released a report dated August 12, 2011 stating the acceptable levels of DA and/or AP for e-liquids as 65 µg for DA and 137 µg per day for AP (1 µg = 1 millionth of a gram).[20] Both Cloud9's and Five Pawns's test results show DA and AP levels that far exceed these limits.  In particular, Absolute Pin tested at 40 µg/ml of DA and an astonishing 2,500 µg/ml of AP. This means, if a person inhales just 2ml of Absolute Pin e-liquid they will be over the recommended intake for DA and more than 36 times over the recommended daily limit for AP. Moreover, almost all of the e-liquids levels disclosed by Defendant in its own test results are higher than 137 µg per day for AP.

---

[19]    *See* ¶ 47 n.17, *supra*.

[20]    *Criteria for a Recommended Standard: Occupational Exposure to Diacetyl and 2,3-Pentanedione*, DEPARTMENT OF HEALTH AND HUMAN SERVICES (Aug. 12, 2011) (draft), http://www.cdc.gov/niosh/docket/archive/pdfs/NIOSH-245/0245-081211-draftdocument.pdf (last visited Nov. 10, 2015).

57.  On June 30, 2015, the ECTA notified 50 vendors via email to withdraw and cease sales of Five Pawns e-liquids. According to ECTA's standards, an e-liquid with AP levels of more than 45 μg/ml but less than 100 μg/ml requires disclosure to the public, and e-liquids with levels of more than 100 μg/ml cannot be sold by ECTA members and immediate stop sale is required.[21]

| | |
|---|---|
| **From:** | ECTA Members |
| **To:** | "ECTA of Canada (info@ectaofcanada.com)" |
| **Cc:** | "Paul Bergen (pbergen1@gmail.com)" |
| **Bcc:** | |

| | |
|---|---|
| **Subject:** | Five Pawns Test Results |
| **Date:** | Tuesday, June 30, 2015 10:39:00 PM |

As many of you may or may not be aware, Five Pawns has released/published their E-Liquid testing results on their website. http://fivepawns.com/five-pawns-test-results/

There is a significant amount of drama behind their publication of these results. Suffice it to say that they appear to have been prompted to release their test results by an E-Liquid Distributor (Cloud 9 in the UK) sending samples to West Yorkshire Analytical lab for Diacetyl (DA) and Acetyl Propionyl (AP) testing.  The flavour samples that they sent came back positive for both compounds as seen below:

| Flavour | DA | AP |
|---|---|---|
| Absolute Pin | 40 | 2500 |
| Bowden's Mate | 90 | 2200 |
| Castle Long | 70 | 900 |
| Gambit | 40 | 2000 |
| Grandmaster | 20 | 300 |
| Lucena | 30 | 340 |
| Queenside | 100 | 1000 |

Those are some of the highest AP number that I think we've ever seen.  Cloud 9 has since removed the test results from their website, "pending legal advice".

Yesterday (6/29), Five Pawns released their own results which conflict with the numbers posted Clound 9. The Five Pawn numbers are seen below:

| Flavour | DA | AP |
|---|---|---|
| Grandmaster | TR < 5 | 130 |
| Gambit | TR < 5 | 360 |
| Queenside | TR < 5 | 350 |
| Bowden's Mate | 6.6 | 910 |
| Absolute Pin | TR < 5 | 290 |
| Castle Long | ND < 5 | 80 |
| Lucena | ND < 5 | 74 |

---

[21]  *ECTA          E-Liquid          Testing          Standards*,          ECTA, http://www.ectaofcanada.com/pagedisp.php?section=E-Liquid_Testing (last visited Nov. 10, 2015).

| | | |
|---|---|---|
| Sixty-Four | ND < 5 | ND < 5 |
| Perpetual Check | 16.6 | ND < 5 |
| Fifth Rank | ND < 5 | ND < 5 |
| Black Flag Fallen | TR < 5 | 65 |

It is difficult to say what we should do in a case like this but unless any member has test results for Five Pawns to the contrary of what Five Pawns themselves say, we need to act on what has been published by the manufacturer.

We need to be sure that we are following our own guidelines because that is why each of us is here as an ECTA member. As such, we ask that our members review the flavours/numbers above. If you are carrying (or considering) any of the liquids that were tested and the results fall within an "action range" (from disclosure to discontinue), please take appropriate action.

Action ranges for Diacetyl are as follows:
- **Non-detection** – This is the goal
- **Less than 22 µg/ml (ppm)** – requires no action
- **Less than 100 µg/ml (ppm)** – requires disclosure to the public but the product can still be sold
- **100 µg/ml (ppm) or more** – cannot be sold by ECTA members and immediate stop sale is required

Action ranges for Acetyl Propionyl are as follows:
- **Non-detection** – This is the goal
- **Less than 45 µg/ml (ppm)** – requires no action
- **Less than 100 µg/ml (ppm)** – requires disclosure to the public but the product can still be sold
- **100 µg/ml (ppm) or more** – cannot be sold by ECTA members and immediate stop sale is required

Given the above action ranges, this is what needs to be done according to those ranges:

| Flavour | DA | AP | ECTA Action |
|---|---|---|---|
| Grandmaster | TR < 5 | 130 | Stop Sale |
| Gambit | TR < 5 | 360 | Stop Sale |
| Queenside | TR < 5 | 350 | Stop Sale |
| Bowden's Mate | 6.6 | 910 | Stop Sale |
| Absolute Pin | TR < 5 | 290 | Stop Sale |
| Castle Long | ND < 5 | 80 | Disclosure |
| Lucena | ND < 5 | 74 | Disclosure |
| Sixty-Four | ND < 5 | ND < 5 | No Action |
| Perpetual Check | 16.6 | ND < 5 | No Action |
| Fifth Rank | ND < 5 | ND < 5 | No Action |
| Black Flag Fallen | TR < 5 | 65 | Disclosure |

58.  In order to create positive spin on the detrimental publicity these test results have caused, Defendant released a statement on its website containing false assertions such as "[H]igh levels of both diacetyl and AP are present in cigarettes, yet there has been no link to bronchial obliterates," and "AP has not been linked to any health concerns related specifically to vaping . . . its relative safety or harm is unknown."[22]  However, studies *have* shown that DA and AP do cause lung damage.[23]

59.  E-cigarettes are a subject of concern to major international entities.  The ECTA took action and ordered a stop sale for five Pawns e-liquids and ordered disclosure of DA and/or AP levels for three Five Pawns e-liquids. A similar trade association in the United Kingdom has taken similar measures regarding Defendant's products.

60.  Numerous other studies have been performed by universities and other research centers, and have reported similar concerns about the potential for health risks associated with electronic cigarettes.

## III.   DEFENDANT'S ADVERTISING OF ITS FIVE PAWNS E-LIQUIDS IS MATERIALLY DECEPTIVE, FALSE AND MISLEADING

61.  Defendant has carried out a consistent and widespread campaign of deceptively promoting its e-liquids.  Its core marketing statement indicating that its products contain quality ingredients or similar variations, and its repeated statements that its products do not contain DA and AP, are false and misleading given the studies discussed above that have found DA and AP in Defendant's e-liquids and that DA and AP are found to be hazardous to one's health.  It is also

---

[22]   *Five Pawns – Be Informed*, FIVE PAWNS (June 29, 2015), http://fivepawns.com/five-pawns-test-results/ (last visited Nov. 10, 2015).

[23]   *See* Farsalinos, Konstantinos E., *et al.*, *Evaluation of Electronic Cigarette Liquids and Aerosol for the Presence of Selected Inhalation Toxins*, J. OF NICOTINE & TOBACCO RESEARCH (Aug. 18, 2014); *see also* ¶ 52 n.20, *supra*.

false and misleading given the content of Defendant's products because there is still insufficient research for Five Pawns to assert or convey that its products do not pose long term health dangers.   Defendant's statements and omissions have occurred in at least three forms, all of which constitute "advertising."   These include: its packaging, inserts to its packaging and shipping materials, and its website through which it directly sells its e-liquids to the public.   Defendant's pervasive advertising message conveys the impression and false statement that its e-liquids do not contain DA and/or AP, and when it felt compelled to release its test results, that the amounts of DA and/or AP that are in fact in its products do not carry any risk of disease.   As demonstrated above in Section II, however, this is materially deceptive, false and misleading given the information revealed by studies that not only do Defendant's e-liquids contain DA and AP, but they are potentially dangerous to consumers' health and they also may carry many risks of disease, including COPD, emphysema, and Bronchiolitis Obliterans. Information regarding the effects of inhaling such substances must be disclosed to ensure that a reasonable consumer is not misled.

62.   Defendant's packaging on its e-liquids only discloses the amount of nicotine, propylene glycol and vegetable glycerin. It does not state that its products contain AP and/or DA, nor does it contain a warning regarding the hazardous effects on the human body of inhaling AP and DA.

63.   Defendant's pattern of deceptive marketing continues today, including false, misleading and deceptive statements, as discussed in Section II, *supra*.

64.   Defendant's current packaging and advertising conveys the impression that the product contains no meaningful health risks other than possibly those that are a direct result of nicotine:



65.   While Defendant does disclose that its e-liquids contain certain levels of nicotine (selected by the customer) and that the ratio of propylene glycol and vegetable glycerin is 50/50, nowhere on the packaging does it mention the existence of DA and AP.  By omitting these ingredients from the label, Defendant denies consumers at the point of sale the opportunity to decide for themselves whether they are willing to take the risk of inhaling these chemicals.  For example, by omitting the ingredients, Defendant hides the fact that its e-liquids contain DA and/or AP, chemicals found to cause various lung diseases and thus no longer used by certain of its competitors in their e-cigarettes.  Moreover, as discussed below, omitting the ingredients on the package conceals the dangers associated with the chemicals contained in its e-liquids, which are described in the studies referenced above.

66.   The text of the warning on Defendant's website reads, in its entirety:

> WARNING: This product is not a smoking cessation product and has not been tested as such. The FDA has not evaluated the safety of this product or any of the statements made by the manufacturer. This product is intended for use by persons of legal age or older, and

not by children, women who are pregnant or breast feeding, or persons with or at risk of heart disease, high blood pressure, diabetes, or taking medicine for depression or asthma. Nicotine is addictive and habit forming, and can be toxic if in contact with skin, or if swallowed. Nicotine can increase your heart rate and blood pressure and cause dizziness, nausea, and stomach pain. Inhalation of this product may aggravate existing respiratory conditions. Ingestion of the non-vaporized concentrated ingredients can be poisonous. This product is not intended to diagnose, treat, cure or prevent any condition, disorder, disease or physical or mental condition.

CA Proposition 65 WARNING: This product contains nicotine, a chemical known to the State of California to cause birth defect or other reproductive harm.

Ingredients: Tobacco-Derived Nicotine, Vegetable Glycerin, Propylene Glycol, and Natural and Artificial Flavors.

Use only as intended - Under age sales to minors are prohibited and subject to criminal and civil penalties.[24]

67. The text on a bottle of Five Pawns e-liquid is as follows[25]:

---

[24]    FIVE PAWNS, http://fivepawns.com (last visited Nov. 10, 2015).

[25]    Actual bottle of Five Pawns e-liquid purchased by Plaintiff Thomas.

- 21 -



68. By warning of risks relating to nicotine, and the risks that may arise if the concentrated contents of the cartridge are swallowed without being vaporized, this packaging implies that those are the only health-related risks that relate to Defendant's e-liquids. The website warning is more substantial compared to the warning label on the product packaging, but still inadequate. Warnings regarding inhalation of the products and that it "may aggravate existing respiratory conditions" is misleading as studies show that inhaling DA and AP causes respiratory conditions, rather than merely aggravating them. Further, the website and the packaging omit reference to the other toxins and impurities, including DA and AP found in Defendant's e-liquids, and inaccurate levels of nicotine, as discussed above in Section II.

69. As demonstrated below, Defendant's pervasive advertisements representing that its products are of high quality and the levels of DA and AP contained therein are materially deceptive, false and misleading given the studies discussed above in Section II and fail to disclose that such research and studies have raised significant concerns about the health risks of Defendant's e-liquids, including but not limited to:

- the harmful impact to lung capacity as a result of the chemicals, including DA, AP, and propylene glycol, that are present in

- 22 -

Defendant's e-liquids; and

- other potentially dangerous but unknown health effects caused by the long term use of e-cigarettes and e-liquids, including Defendant's e-liquids.

70.   On June 29, 2015, in the "News" section of its website, Defendant told its customers and potential customers:

In response to the diacetyl concern in 2014, some vapor industry flavor suppliers began using acetyl propionyl (AP), Also known as 2,3 pentanedione, as a substitute for diacetyl. While AP has not been linked to any health concerns related specifically to vaping, and it is not banned by the FDA or any International body, its relative safety or harm is unknown.[26]

71.   Defendant also stated:

Five Pawns does not feel there is any concern with diacetyl or AP in our e-liquids at current levels.  AP can be an important flavor enhancer for flavor profiles that are creamy in nature, and is used widely in the food and beverage industries.[27]

72.   Again, this is false and misleading because, as shown in Section II, *supra*, DA and AP are harmful to the user's health. The fact that AP is approved by the FDA as an ingredient in food for ingestion is irrelevant as it is proven, as described in Section II, that ingesting AP is safe but inhaling AP is not.

73.   By stating that the FDA has yet to ban DA and AP, and only including a warning regarding the harmful effects of ingestion on its product packaging, Defendant creates the false and misleading impression that these substances carry

---

[26]   *See* ¶ 53 n.21, *supra*.

[27]   *Id.*

- 23 -

no risk and are safe as used for inhalation, as discussed above.  However, the gastrointestinal system processes foreign matter differently than the respiratory system, and ingredients that may be safe when digested may not be safe when inhaled, especially with long term use.  The additional statement that AP "is not banned by the FDA or any International body" is itself misleading in the absence of reference to the studies finding that these ingredients may not be safe when inhaled, including, but not limited to, the studies referenced in Section II above. For example, the study conducted by Professor Farsalinos stated: "Although the majority of flavourings are 'Generally Recognized As Safe' (GRAS) for food use, these substances have not been adequately tested for safety when inhaled." *See* ¶ 53 n.22 at 3, *supra*.  Farsalinos continued:

> [T]here are some chemicals which, although approved for ingestion, have already established adverse health effects when inhaled. A characteristic example of this is diacetyl [DA]. This substance, also known as 2,3-butanedione, is a member of a general class of organic compounds referred to as diketones . . . [DA] has been associated with decline in respiratory function, manifested as reduced Forced Expiratory Volume in . . . subjects exposed to it through inhalation. Additionally it has been implicated in the development of bronchiolitis obliterans . . . .

*Id.* at 4.

74.  Also found in the June 29, 2015 blog post in the "News" section on Defendant's website, Defendant states, with respect to DA that it "can naturally occur in vapor liquids, just as with beer and wine, and some fruits such as strawberries."[28]

---

[28]  *See* ¶ 53 n.21, *supra*.

- 24 -

75. To draw a parallel between DA in e-liquids and beer, wine, and strawberries is deceptive and misleading, as demonstrated by the studies cited *supra* in Section II.

76. Finally, Defendant lists the other ingredients of its e-liquids as unspecified "Natural and Artificial Flavors." This is deceptive and misleading because the website does not disclose what those "Flavors" are or, if they contain AP and/or DA nor does it acknowledge that safety for use in food products does not denote safety for use in inhaled products, as described above.

77. On July 9, 2015, Plaintiffs, through their attorneys, sent Defendant a pre-suit demand letter describing the allegations in this complaint.

78. On July 21, 2015, Defendant released its latest test results on its current ten vapor liquid flavors. Results for five of those ten flavors were identical to the results from the test performed on October 2014. After numerous comments on social media regarding the virtual impossibility of obtaining the same results down to the tenth of a μg/ml, on July 24, 2015, Defendant was compelled to insert asterisks in the "new" test results explaining that, five of those ten flavors, were in fact, not retested at all. The Company is therefore continuing to deceive its consumers. In fact, the post dated July 21, 2015 continues to state that "Five Pawns is pleased to release the latest test results on our current 10 vapor liquid flavors."[29] The disclaimer that Defendant inserted can only be seen if you click on the pdf document embedded in the blog post.

79. On August 7, 2015, counsel for Defendant sent a letter to counsel for the Class and Subclasses. In the letter, counsel described the actions purportedly taken by Defendant to cure the violations in Plaintiffs' pre-suit demand letter.

---

[29] *Five Pawns 3Q 2015 & Past 12 Months Test Results*, FIVE PAWNS (July 21, 2015), http://fivepawns.com/fivepawns-2015-test-results/ (last visited Nov. 10, 2015).

Defendant claimed that it had "taken proactive steps to ensure proper communication, correction, and clarification of any prior inaccurate statements, including removing all outdated responses from all customer service computers," as an effort to correct its "inadvertent mistaken responses" to "specific inquiries by a handful of individuals."

80.   Counsel for Defendant also stated that moving forward, Defendant will post results from DA and AP testing "on all of its liquids" on its website on a quarterly basis. *Id.*

81.   The letter also stated that Defendant had contacted recipients of the communications at issue and had offered refunds as compensation.

82.   These actions fail to cure the defects as alleged in this Complaint. Defendant continues to misrepresent to its customers the adverse health effects of its products. Its website continues to state that Defendant "source[s] solely diacetyl-free ingredients, only to discover that trace amounts of diacetyl can naturally occur in vapor liquids . . . ."[30] This statement is false as the results from Defendant's own testing show, that some of Defendant's e-liquids contain levels of diacetyl that exceed amounts that are naturally occurring.

83.   Defendant also states that "AP has not been linked to any health concerns related specifically to vaping . . . and its relative safety or harm is unknown."[31]  This statement is false as studies have demonstrated that AP (as well as DA) causes significant damage to the lungs. [32]

---

[30]      *See* ¶ 53 n.21, *supra.*

[31]      *Id.*

[32]      *NIOSH Alert: Preventing Lung Disease in Workers Who Use or Make Flavorings*, DEP'T OF HEALTH AND HUMAN SERVICES (Dec. 2003), http://www.cdc.gov/niosh/docs/2004-110/pdfs/2004-110.pdf (last visited Nov. 10, 2014).

84.   Moreover, contrary to the letter, Defendant does not post test results of "all of its liquids." Defendant, in a footnote contained in a document embedded on its website, admitted that some of its e-liquids have not been tested since September 2014.

85.   The fact that Defendant contacted a "handful of individuals" by email does not cure the violations outlined in this Complaint. Not only does the email contain more false statements and misrepresentations – *i.e.*, that the diacetyl found in Defendant's e-liquids are naturally occurring, and that Defendant will "post test results quarterly on all of its liquids – but contacting a few individuals is insufficient to cure the alleged violations for the proposed Class and Subclasses.

86.   On August 21, 2015, Defendant announced on its website that it is ceasing production on five of its e-liquid flavors – Absolute Pin, Sixty-Four, Fifth Rank, Lucena, and Perpetual Check, and consolidating the other five flavors, Castle Long, Grandmaster, Gambit, Queenside, and Bowden's Mate, into a collection called The Insignia Series.[33] These actions are also insufficient to cure the alleged violations for the proposed Class and Subclasses.

87.   On September 9, 2015, counsel for Plaintiffs responded to the August 7, 2015 letter asserting that the actions Defendant had taken to date do not cure the defects alleged herein.  Enclosed with the letter was a draft copy of this complaint and an invitation to confer regarding the outstanding violations.

## CLASS ACTION AND PRIVATE ATTORNEY GENERAL ALLEGATIONS

88.   Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure ("Rule") for the purpose of asserting the claims alleged in this Complaint on a common basis.

---

[33] *Updated Tasting Notes*, FIVE PAWNS (Aug. 21, 2015), http://fivepawns.com/updated-tasting-notes/ (last visited Nov. 10, 2015).

Plaintiffs bring this action on behalf of themselves and all members of the following class comprised of:

> All persons, exclusive of Defendant and its employees, who purchased in the United States, one or more Five Pawns e-liquids sold by Defendant from November 2012 to the present (the "Class").

89.   Plaintiff Greene brings this action on behalf of himself and all members of the following subclass comprised of:

> All persons, exclusive of Defendant and its employees, who purchased in Indiana one or more Five Pawns e-liquids sold by Defendant from November 2012 to the present (the "Indiana Subclass").

90.   Plaintiff Thomas brings this action on behalf of himself and all members of the following subclass comprised of:

> All persons, exclusive of Defendant and its employees, who purchased in New York State one or more Five Pawns e-liquids sold by Defendant from November 2012 to the present (the "New York Subclass").

91.   Plaintiff Simonds brings this action on behalf of himself and all of the following subclass comprised of:

> All persons, exclusive of Defendant and its employees, who purchased in Vermont one or more Five Pawns e-liquids sold by Defendant from December   2012 to the present (the "Vermont Subclass").

92.   The Indiana Subclass, the New York Subclass and the Vermont Subclass are collectively referred to herein as the "Subclasses," and the Class and Subclasses are collectively referred to herein as the "Classes."

93.   Plaintiffs reserve the right to modify or amend the definitions of the Classes after they have had an opportunity to conduct discovery.

94. ***Numerosity.   Rule 23(a)(1).***   The members of the Classes are so numerous that their individual joinder is impracticable.  Plaintiffs are informed and believe that the proposed Classes contain at least thousands of purchasers of Defendant's e-liquids who have been damaged by Defendant's conduct as alleged herein.   The number of Class members is unknown to Plaintiffs but could be discerned from the records maintained by Defendant.

95. ***Existence of Common Questions of Law and Fact.   Rule 23(a)(2).*** This action involves common questions of law and fact, which include, but are not limited to, the following:

        a.    Whether the statements made by Defendant as part of its advertising for Defendant's e-liquids discussed herein are true, or are reasonably likely to deceive, given the omissions of material fact described above;

        b.    Whether Defendant's conduct described herein constitutes a deceptive act or practice in violation of the CLRA;

        c.    Whether Defendant's conduct described herein constitutes an unlawful, unfair, and/or fraudulent business practice in violation of the UCL;

        d.    Whether Defendant's conduct described herein constitutes unfair, deceptive, untrue or misleading advertising in violation of the UCL;

        e.    Whether Defendant's conduct described herein constitutes unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce in violation of the VCPA;

        f.    Whether Defendant's conduct constitutes a breach of express warranty;

g.    Whether Defendant's conduct described herein constitutes an unconscionable, deceptive, or unfair act or practice in violation of the Indiana Deceptive Consumer Sales Act;

h.    Whether Defendant's conduct described herein constitutes a deceptive act or practice in violation of the GBL;

i.    Whether Defendant's conduct described herein constitutes an unfair method of competition, unfair or deceptive acts or practices, and anti-competitive practices in violation of the VCPA;

j.    Whether Plaintiffs and the other members of Classes are entitled to damages; and

k.    Whether Plaintiffs and the Classes are entitled to injunctive relief, restitution or other equitable relief and/or other relief as may be proper.

96. ***Typicality.   Rule 23(a)(3).***   All members of the Classes have been subject to and affected by the same conduct and omissions by Defendant.  The claims alleged herein are based on the same violations by Defendant that harmed Plaintiffs and members of the Classes.  By purchasing Five Pawns e-liquids during the relevant time period, all members of the Classes were subjected to the same wrongful conduct.  Plaintiffs' claims are typical of the Classes' claims and do not conflict with the interests of any other members of the Classes.  Defendant's unlawful, unfair, deceptive, and/or fraudulent actions and breaches of warranty concern the same business practices described herein irrespective of where they occurred or were experienced.

97. ***Adequacy.  Rule 23(a)(4).***  Plaintiffs will fairly and adequately protect the interests of the members of the Classes.  Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to

prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Classes.

98.  ***Injunctive and Declaratory Relief.  Rule 23(b)(2).***  Defendant's actions regarding the deceptions and omissions regarding Five Pawns e-liquids are uniform as to members of the Classes.  Defendant has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief as requested herein is appropriate respecting the Classes as a whole.

99.  ***Predominance and Superiority of Class Action.   Rule 23(b)(3).***  Questions of law or fact common to the Classes predominate over any questions affecting only individual members, and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

        a.    Absent a class action, members of the Classes as a practical matter will be unable to obtain redress, Defendant's violations of their legal obligations will continue without remedy, additional consumers will be harmed, and Defendant will continue to retain its ill-gotten gains;

        b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

        c.    When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class;

        d.    A class action will permit an orderly and expeditious administration of the claims of each member of the Classes and foster economies of time, effort, and expense;

        e.    A class action regarding the issues in this case does not create

- 31 -

1    any problems of manageability; and

2    f.    Defendant has acted on grounds generally applicable to the

3    members of the Classes, making class-wide monetary relief

4    appropriate.

5    100. Plaintiffs do not contemplate class notice if the Classes are certified

6    under Rule 23(b)(2), which does not require notice, and notice to the putative

7    Classes may be accomplished through publication, signs or placards at the point-

8    of-sale, or other forms of distribution, if necessary; if the Classes are certified

9    under Rule 23(b)(3); or if the Court otherwise determines class notice is required.

10   Plaintiffs will, if notice is so required, confer with Defendant and seek to present

11   the Court with a stipulation and proposed order on the details of a class notice

12   program.

13   **<u>COUNT I</u>**

14   **Violations of the Consumers Legal Remedies Act**

15   **(Cal. Civil Code §§ 1750, *et seq.*)**

16   **(On Behalf of Plaintiffs and the Class)**

17   101. Plaintiffs repeat and reallege the allegations contained in the paragraphs

18   above, as if fully set forth herein.

19   102. This cause of action is brought pursuant to the Consumers Legal

20   Remedies Act, California Civil Code §§ 1750, *et seq.* (the "CLRA"), which

21   provides that enumerated listed "unfair methods of competition and unfair or

22   deceptive acts or practices [including those listed below in ¶ 101] undertaken by

23   any person in a transaction intended to result or which results in the sale or lease of

24   goods or services to any consumer are unlawful," Cal. Civ. Code § 1770, and that

25   "[a]ny consumer who suffers any damage as a result of the use or employment by

26   any person of a method, act, or practice declared to be unlawful by Section 1770

27   may bring an action against that person to recover or obtain," various forms of

28   - 32 -

relief, including an injunction and damages.  Cal. Civ. Code § 1780.  This cause of action is seeks both injunctive relief and damages on behalf of the Class.

103. On July 9, 2015, prior to the filing of this Complaint, Plaintiffs sent Defendant a CLRA notice letter providing the notice required by California Civil Code section 1782(a).  Plaintiffs sent the letter via certified mail, return receipt requested, to Defendant's principal place of business in Irvine, California advising Defendant that it is in violation of the CLRA and must correct, replace or otherwise rectify the goods and/or services alleged to be in violation of section 1770.  Defendant was further advised that in the event the relief requested was not provided within thirty (30) days, Plaintiffs would file their Complaint that would include a request for monetary damages pursuant to the CLRA.  A true and correct copy of Plaintiffs' letter is attached hereto as Exhibit A.

104. On August 7, 2015, Defendant, by its attorneys, responded to Plaintiffs' letter.  A true and correct copy of Defendant's letter is attached hereto as Exhibit B.  As set forth in Defendant's letter, Defendant did not correct, replace, or otherwise rectify the goods and/or services alleged in Plaintiffs' letter. Accordingly, Plaintiffs seek monetary damages pursuant to the CLRA.

105. Plaintiffs were deceived by Defendant's unlawful practices as described more fully above, which included carrying out an advertising campaign, directed at Plaintiffs and the Class, conveying the message that Defendant's e-liquids are free of DA and AP and variations of that statement.  This advertising campaign was deceptive, false and misleading given: the ingredients and characteristics of Defendant's products which were known or should have been known to Defendant; and the test results and studies that have found DA and AP and other harmful impurities in Defendant's e-liquids, and that inhaling these substances could be harmful to health, none of which was disclosed.  Also undisclosed was the lack of research required to assess the potential danger of electronic cigarettes, especially

in long term users.

106.   Defendant's actions, representations and conduct have violated, and continue to violate, the CLRA because they extend to transactions that are intended to result, or which have resulted, in the sale of goods to consumers.

107.   Defendant marketed, sold and distributed its e-liquids in California and throughout the United States during the relevant period.

108.   Plaintiffs and members of the Class are "consumers" as that term is defined by the CLRA in California Civil Code section 1761(d).

109.   Defendant's e-liquids were and are "good[s]" within the meaning of California Civil Code section 1761(a) & (b).

110.   Defendant violated the CLRA by engaging in at least the following practices proscribed by California Civil Code section 1770(a) in transactions with Plaintiffs and the Class which were intended to result in, and did result in, the sale of Defendant's e-liquids:

(5)  Representing that [Five Pawns e-liquids] have . . . approval, characteristics . . . uses [or] benefits . . . which they do not have . . . .

***

(7) Representing that [Five Pawns e-liquids] are of a particular standard, quality or grade . . . if they are of another.

***

(9) Advertising goods . . . with intent not to sell them as advertised.

111.   As such, Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices because it does not sell, and because it intends not to sell, the e-liquids as advertised and instead misrepresents the particulars by, in its marketing, representing its e-liquids as described above when it knew, or should have known, that the representations and advertisements were deceptive, false and misleading in light of the omissions of material facts as

- 34 -

described above.

112.   The omitted information would have been material to a reasonable customer in his or her decision as to whether to purchase Defendant's e-liquids and/or purchase Defendant's e-liquids at the price at which they were offered.

113.   Defendant had a duty to disclose this information to Plaintiffs and the members of the Class for several reasons.  First, Defendant repeatedly made the representation that its products are free of DA and AP and that even if they do, they do contain those ingredients, they do not pose a health risk, or closely analogous representations, as detailed above.   Disclosure of the omitted information, including information in the studies referred to *supra* in Section II, was necessary to avoid the false impression of safety provided by that tagline. Second, Defendant was in a position to know of the omitted information, both from its own product knowledge and creation decisions and the studies of the presence of DA and AP in its e-liquids, especially as described in the studies and test results, including Defendant's own test results referenced *supra* in Section II, while consumers were not reasonably in a position to be aware of Defendant's internal product information or such studies.  Third, Defendant actively failed to disclose these material facts to, or actively concealed these material facts from, Plaintiffs and the Class.  Finally, while Defendant made representations about the risks associated with its e-liquids, stating that its products contain nicotine and that consumers bear risks related thereto, those representations were misleading half-truths because they implied that those are all of the risks relating to the product, when, in fact, they are not.

114.   Defendant provided Plaintiffs and the other Class members with e-liquids that did not match the quality portrayed by its marketing.

115.   As a result, Plaintiffs and members of the Class have suffered irreparable harm.   Plaintiffs' and the other Class members' injuries were

- 35 -

proximately caused by Defendant's conduct as alleged herein.   Plaintiffs, individually and on behalf of all other Class members, seek entry of an order enjoining Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code section 1780(a)(2), awarding exemplary and punitive damages against Defendant pursuant to California Civil Code sections 1780(a)(1) and (a)(4), and ordering the payment of costs and attorneys' fees, and such other relief as deemed appropriate and proper by the Court under California Civil Code section 1780(a)(2).  If Defendant is not restrained from engaging in these practices in the future, Plaintiffs and the Class will continue to suffer harm.

116.   Pursuant to section 1780(d) of the CLRA, attached hereto as Exhibit C is an affidavit showing that this action has been commenced in the proper forum.

## COUNT II

### Violations of the Unfair Competition Law

### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

### (On Behalf of Plaintiffs and the Class)

117.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

118.   The Unfair Competition Law, Cal. Business & Professions Code §§ 17200, *et seq.* ("UCL"), prohibits any "unlawful," "unfair," or fraudulent, business act or practice and any false or misleading advertising.

119.   In the course of conducting business, Defendant committed unlawful business practices by, *inter alia*, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts, as set forth more fully herein, and violating California Civil Code sections 1750, *et seq.*, and the common law.

120.   Plaintiffs, individually and on behalf of other Class members, reserve the right to allege other violations of law which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

121.   Defendant's actions constitute "unfair" business acts or practices because, as alleged above, *inter alia*, Defendant engages in deceptive and false advertising, and misrepresents and omits material facts regarding its e-liquids, and thereby offends an established public policy, and engages in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.  This conduct constitutes violations of the unfair prong of Business & Professions Code sections 17200, *et seq.*

122.   Business & Professions Code sections 17200, *et seq.*, also prohibits any "fraudulent business act or practice."

123.   Defendant's actions, claims, nondisclosures, and misleading statements, as alleged in this Complaint, also constitute "fraudulent" business practices in violation of the UCL because, among other things, they are false, misleading, and/or likely to deceive reasonable consumers within the meaning of Business & Professions Code sections 17200, *et seq.*

124.   There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

125.   As a result of Defendants' pervasive false marketing, including deceptive and misleading acts and omissions as detailed in this Complaint, Plaintiffs and other members of the Class have in fact been harmed as described above.  If Defendant had disclosed the information discussed above about its e-liquids and otherwise been truthful about their safety, Plaintiffs would not have paid as much for Defendant's e-liquid products or would not have purchased Defendant's e-liquid products.  Defendant was also able to charge more than what its e-liquids would have been worth had it disclosed the truth about them.

126.   As a result of Defendant's unlawful, unfair, and fraudulent practices, Plaintiffs and the other Class members have suffered injury in fact and lost money.

127.   Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct.   Accordingly, injunctive relief is appropriate for Plaintiffs and the Class.

128.   As a result of Defendant's conduct in violation of the UCL, Plaintiffs and members of the Class have been injured as alleged herein in amounts to be proven at trial because they purchased Defendant's e-liquids without full disclosure of the material facts discussed above.

129.   As a result, Plaintiffs individually, and on behalf of the Class, and the general public, seek restitution of all money obtained from Plaintiffs and the other members of the Class collected by Defendant as a result of its unlawful, unfair, and/or fraudulent conduct, and seek injunctive relief, and all other relief this Court deems appropriate, consistent with Business and Professions Code section 17203.

130.   Plaintiffs are also suing on behalf of the general public as defined in Business and Professions Code section 17204 in order to enjoin and remedy the ongoing unlawful, unfair, and fraudulent business practices alleged herein and to obtain declaratory, injunctive, and other appropriate relief on behalf of all those members of the general public who have been victimized by Five Pawns's actions.

<u>**COUNT III**</u>

**Violations of the False Advertising Law**

**(Cal. Bus. & Prof. Code §§ 17500 *et seq*.)**

**(On Behalf of Plaintiffs and the Class)**

131.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

- 38 -

132.   Plaintiffs have standing to pursue this claim as Plaintiffs suffered injury in fact as a result of Defendant's actions as set forth herein. Specifically, prior to the filing of this action, Plaintiffs purchased Defendant's e-liquids in reliance upon Defendant's marketing claims. Plaintiffs used Defendant's e-liquids believing that the products were of a higher quality and safer to consume than as advertised.

133.   Defendant's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to California Business and Professions Code sections 17500, *et seq.*, because Defendant has advertised its Products in a manner that is untrue and misleading, or that Defendant knew was untrue or misleading, or omitted material information from its advertising which Defendant had a duty to disclose.

134.   Defendant's wrongful business practices have caused injury to Plaintiffs and the Class, in the form of the lost purchase price of the e-juices. Plaintiffs and the Class purchased the products after being exposed to Defendant's false or deceptive advertising claims, as described herein.

135.   Defendant's conduct caused and continues to cause substantial injury to Plaintiffs and the other members of the Class. Plaintiffs and the Class continue to be exposed to Defendant's false and/or misleading advertising every time they shop for e-liquids and encounter Defendant's false or deceptive advertising on store shelves or on the internet. Defendant's competitors will also continue to suffer from Defendant's unfair or deceptive business conduct if injunctive relief is not afforded.

136.   Pursuant to section 17535 of the California Business and Professions Code, Plaintiff and the Class seek an order of this Court enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

- 39 -

137.   Plaintiff and the Class also seek an order for the restitution of all monies from the sale of Defendant's e-liquids, which were unjustly acquired through acts of unlawful, unfair, and/or fraudulent competition.

### COUNT IV

**Breach of the Indiana Deceptive Consumer Sales Act**

**(Ind. Code §§ 24-5-0.5, *et seq.*)**

**(On Behalf of Plaintiff Greene and the Indiana Subclass)**

138.   Plaintiff Greene repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

139.   This cause of action is brought pursuant to the Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5, *et seq.* (the "IDCSA" or the "Act"). The stated purpose of the Act is to "protect consumers from supplies who commit deceptive and unconscionable sales acts" and to "encourage the development of fair consumer sales practices." Ind. Code § 24-5-0.5-1(b).

140.   This cause of action is for damages pursuant to Indiana Code section 24-5-0.5-4(a).   Pursuant to the Act, a consumer may bring an action "for the damages actually suffered . . . as a result of the deceptive act or [\$500], whichever is greater." Ind. Code § 24-5-0.5-4(a).

141.   Plaintiff Greene and each member of the Indiana Subclass are consumers and purchased Defendant's e-liquids during the period of Defendant's pervasive false advertising.

142.   Defendant is engaged in trade or commerce within the meaning of the Act.

143.   Indiana Code section 24-5-0.5-2(a)(8) defines "incurable deceptive act" as "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." The wrongs complained of herein are "incurable deceptive acts" as Plaintiffs gave Defendant sufficient notice and an opportunity to

cure, as alleged more fully *infra*.

144.   Defendant has violated the Act by engaging in the unfair and deceptive practices as described herein, which included carrying out an advertising campaign, directed at Plaintiff Greene and the Indiana Subclass, conveying the message that Defendant's e-liquids are free of DA and/or AP and that they are not harmful even if those ingredients do exist in their products, and variations of that statement, which were deceptive, false and misleading given the studies that have found carcinogens, toxins, and other potentially harmful impurities in Defendant's e-liquids and in e-liquids generally.  Also undisclosed was the lack of additional research which such studies have determined is required to assess the potential danger of e-liquids, especially in long term users,  which failure to disclose offends public policies and is immoral, unethical,  unscrupulous and substantially injurious to consumers.

145.   Plaintiff Greene and the members of the Indiana Subclass have been aggrieved by Defendant's unfair and deceptive practices in that they purchased Defendant's e-liquids.  As a result of Defendant's unfair and deceptive acts, and unlawful conduct, Plaintiff Greene and the other members of the Indiana Subclass have in fact been harmed.  If Defendant had disclosed the information discussed above about Defendant's e-liquids and had been otherwise truthful about their safety, Plaintiff Greene would not have paid as much for Defendant's e-liquid products or would not have purchased Defendant's e-liquid products.   In fact, Defendant was able to charge more than what its e-liquids would have been worth had it disclosed the truth about them.

146.   The damages suffered by Plaintiff Greene and the Indiana Subclass were directly and proximately caused by Defendant's unfair and deceptive practices, as more fully described herein.

147.   On July 9, 2015, prior to the filing of this Complaint, Plaintiffs sent Defendant a notice letter pursuant to Indiana Code section 24-5-0.5-4(a) providing the required notice.   Plaintiffs sent the letter via certified mail, return receipt requested, to Defendant's principal place of business in Irvine, California advising Defendant that it is in violation of the Act and must correct, replace or otherwise rectify the goods and/or services alleged to be in violation of the Act.   Defendant was further advised that in the event the relief requested has not been provided within thirty (30) days, Plaintiffs would file their Complaint that would include a request for monetary damages pursuant to the Act.   A true and correct copy of Plaintiffs' letter is attached hereto as Exhibit A.

148.   On August 7, 2015, Defendant, by its attorneys, responded to Plaintiffs' letter.  A true and correct copy of Defendant's letter is attached hereto as Exhibit B.  As set forth in Defendant's letter, Defendant did not correct, replace, or otherwise rectify the goods and/or services alleged to be in violation of the Act in Plaintiffs' letter.  Accordingly, Plaintiff Greene seeks monetary damages pursuant to the Act.

149.   Pursuant to Indiana Code section 24-5-0.5-4(c) Plaintiff Greene, on behalf of himself and the Indiana Subclass, seeks a declaratory judgment and a court order enjoining the above-described wrongful acts and practices of Defendant and for restitution.

150.   Additionally, pursuant to Indiana Code section 24-5-0.5-4, Plaintiff Greene, on behalf of himself and the Indiana Subclass, seeks damages, attorneys' fees and costs.

### COUNT V

**Violations of the New York General Business Law**

**(N.Y. GBS Law § 349)**

**(On Behalf of Plaintiff Thomas and the New York Subclass)**

151.   Plaintiff Thomas repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

152.   This cause of action is brought pursuant to the New York General Business Law section 349 ("GBL § 349"), which prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York State.

153.   The conduct of Defendant alleged herein violates GBL § 349 in that Defendant engaged in the unfair and deceptive practices as described herein, which included carrying out an advertising campaign, directed at Plaintiff Thomas and the New York Subclass, conveying the message that Defendant's e-liquids are free of DA and/or AP and that they are not harmful even if those ingredients do exist in their products, and variations of that statement, which were deceptive, false and misleading given the studies that have found carcinogens, toxins, and other potentially harmful impurities in Defendant's e-liquids and in e-liquids generally. Also undisclosed was the lack of additional research which such studies have determined is required to assess the potential danger of e-liquids, especially in long term users,  which omissions offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers. Such conduct is inherently and materially deceptive and misleading, and Defendant knew, or by the exercise of reasonable care should have known, that its misstatements and omissions were untrue, deceptive or misleading.

154.   The materially misleading conduct of Defendant alleged herein was directed at the public at large.

155.   Defendant's acts and practices described above are likely to mislead a reasonable consumer acting reasonably under the circumstances.

156.   Defendant has willfully and knowingly violated GBL § 349 because, in order to increase its own profits, Defendant intentionally engaged in deceptive and false advertising, misrepresentations and omission of material facts regarding its e-liquids as discussed above.

157.   As a result of Defendant's deceptive and misleading acts, Plaintiff Thomas and the other members of the New York Subclass have been injured because they purchased Defendant's e-liquids without full disclosure of the material facts discussed above.

158.   As a result of Defendant's conduct in violation of GBL § 349, Plaintiff Thomas and the other members of the New York Subclass have been injured as alleged herein in amounts to be proven at trial because if Defendant had disclosed the information discussed above about its e-liquids and otherwise been truthful about their safety, Plaintiff Thomas would not have paid as much for Defendant's e-liquid products or would not have purchased Defendant's products. Defendant was also able to charge more than what its e-liquids would have been worth had it disclosed the truth about them.

159.   As a result, pursuant to GBL § 349, Plaintiff Thomas and the New York Subclass are entitled to make claims against Defendant for actual or statutory damages to be determined at trial, but for not less than fifty (50) dollars per New York Subclass member, such damages to be trebled.

160.   Additionally, pursuant to GBL § 349, Plaintiff Thomas and the New York Subclass make claims for  attorneys' fees, costs, and injunctive relief requiring Defendant to adequately disclose the omitted information described above.

- 44 -

## COUNT VI

### Violations of Vermont Consumer Protection Act

### (9 V.S.A. § 2451, *et seq.*)

### (On Behalf of the Plaintiff Simonds and the Vermont Subclass)

161.   Plaintiff Simonds repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

162.   This cause of action is brought pursuant to VCPA.  The stated purpose of the Act is to "complement the enforcement of federal statutes and decisions governing unfair methods of competition, unfair or deceptive acts or practices, and anti-competitive practices in order to protect the public and to encourage fair and honest competition." 9 V.S.A. § 2451.

163.   This cause of action is for damages pursuant to the VCPA, 9 V.S.A. § 2461(b).  Pursuant to the VCPA, "[a]ny consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices prohibited by section 2453 of this title, or who sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453 of this title, or prohibited by any rule or regulation made pursuant to section 2453 of this title may sue for appropriate equitable relief and may sue and recover from the seller, solicitor, or other violator the amount of his or her damages, or the consideration or the value of the consideration given by the consumer, reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by the consumer. Any language, written or oral, used by a seller or solicitor, which attempts to exclude or modify recovery of the penalty or reasonable attorney's fees shall be unenforceable."

164.   Plaintiff Simonds and each member of the Vermont Subclass are "consumers" and purchased Defendant's "goods," e-liquids, during the period of Defendant's pervasive false advertising pursuant to 9 V.S.A. § 2451a. Defendant is

a person regularly and principally engaged in a business of selling goods or services to consumers and trade and commerce under the VCPA.

165.   The VCPA states that unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are hereby declared unlawful. The Act further defines evidence of fraud as "[t]he failure to sell any goods or services in the manner and of the nature advertised or offered, or the refusal or inability to sell any goods or services at the price advertised or offered or in accordance with other terms or conditions of the advertisement or offer, creates a rebuttable presumption of an intent to violate the provisions of this chapter. No actual damage to any person need be alleged or proven for an action to lie under this chapter."

166.   Defendant has violated the VCPA by engaging in the unfair and deceptive practices as described herein, which included carrying out an advertising campaign, directed at Plaintiff Simmonds and the Vermont Subclass, conveying the message that Defendant's e-liquids are free of DA and/or AP and that they are not harmful even if those ingredients do exist in their products, and variations of that statement, which were deceptive, false and misleading given the studies that have found carcinogens, toxins, and other potentially harmful impurities in Defendant's e-liquids and in e-liquids generally.

167.   Plaintiff Simonds and the members of the Vermont Subclass have been aggrieved by Defendant's unfair and deceptive practices in that they purchased Defendant's e-liquids.  As a result of Defendant's unfair and deceptive acts, and unlawful conduct, Plaintiff Simmonds and the other members of the Vermont Subclass have in fact been harmed.  If Defendant had disclosed the information discussed above about Defendant's e-liquids and had been otherwise truthful about their safety, Plaintiff Simmonds would not have paid as much for Defendant's e-liquid products or would not have purchased Defendant's products.

1    In fact, Defendant was able to charge more than what its e-liquids would have been

2    worth had it disclosed the truth about them.

3        168.   The damages suffered by Plaintiff Simonds and the Vermont Subclass

4    were directly and proximately caused by Defendant's unfair and deceptive

5    practices, as more fully described herein.

6        169.   Pursuant to 9 V.S.A. § 2451, *et seq.* Plaintiff Simonds, on behalf of

7    himself and the Vermont Subclass, seeks a declaratory judgment and a court order

8    enjoining the above-described wrongful acts and practices of Defendant and for

9    restitution.

10       170.   Additionally, pursuant to 9 V.S.A. § 2461, Plaintiff Simonds, on

11   behalf of himself and the Vermont Subclass, seeks damages, attorneys' fees and

12   costs.

13                              **COUNT VII**

14                      **Breach of Express Warranty**

15              **(On Behalf of Plaintiffs and the Class)**

16       171.   Plaintiffs repeat and reallege the allegations contained in the

17   paragraphs above, as if fully set forth herein.

18       172.   Plaintiffs bring this claim individually and on behalf of the Class.

19       173.   Plaintiffs, and each member of the Class, formed a contract with

20   Defendant at the time Plaintiffs and the other members of the Class purchased

21   Defendant's e-liquids or related paraphernalia.  The terms of that contract include

22   the promises and affirmations of fact made by Defendant on its e-liquids packaging

23   and inserts and through the Five Pawns marketing campaign, as described above.

24   This product packaging and advertising constitutes express warranties, became part

25   of the basis of the bargain, and is part of a standardized contract between Plaintiffs

26   and the members of the Class on the one hand, and Defendant on the other.

27       174.   Plaintiffs and the Class members performed their obligations under the

28                                    - 47 -

1    contract.

2        175.   Defendant breached the terms of this contract, including the express

3    warranties, with Plaintiffs and the Class by not providing Defendant's e-liquids that

4    offered a product free of DA and AP (or similar variations) and otherwise omitted

5    material information about potential health risks associated with the product.  Such

6    express warranties breached by Defendant include the representations set forth

7    above in Sections II and III.

8        176.   As a result of Defendant's breach of its contract, Plaintiffs and the

9    Classes have been damaged in the amount of the purchase price of the Five Pawns

10   e-liquids they purchased.

**PRAYER FOR RELIEF**

12       Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated,

13   and the general public, pray for a judgment:

14       a.    Certifying each of the Classes as requested herein, appointing

15             Plaintiffs Greene, Thomas, Hirtzel, Swetala and Simonds as class

16             representatives for the Class and respective Subclasses;

17       b.    Requiring Defendant to disgorge or return all monies, revenues and

18             profits obtained by means of any wrongful act or practice to Plaintiffs

19             and the members of the Classes under each cause of action where such

20             relief is permitted;

21       c.    Enjoining Defendant from continuing the unlawful practices as set

22             forth herein, including marketing or selling its e-liquids without

23             disclosing the potential health risks relating thereto, and directing

24             Defendant to engage in corrective action, or providing other injunctive

25             or equitable relief;

26       d.    Awarding damages pursuant to California Civil Code section 1780,

27             the Indiana Deceptive Consumer Sales Act, GBL § 349, and   9

28                                    - 48 -

1    V.S.A. § 2451, *et seq.* including exemplary and punitive damages to

2    prevent and deter Defendant from future unlawful conduct;

3    e.    Awarding damages for breach of express warranty;

4    f.    Awarding all equitable remedies available pursuant to California Civil

5    Code section 1780, Indiana Code section 24-5-0.5-4(c), GBL § 349, 9

6    V.S.A. § 2451, *et seq.* and other applicable law;

7    g.    Awarding attorneys' fees and costs;

8    h.    Awarding pre-judgment and post-judgment interest at the legal rate;

9    and

10    i.    Providing such further relief as may be just and proper.

11    **<u>DEMAND FOR JURY TRIAL</u>**

12    Plaintiffs hereby demand a trial by jury on all issues so triable.

13    DATED:  December 14, 2015        **WOLF HALDENSTEIN ADLER**
14                                    **FREEMAN & HERZ LLP**

15                            By:    _/s/ Rachele R. Rickert_
16                                   RACHELE R. RICKERT

17    BETSY C. MANIFOLD
      manifold@whafh.com
18    RACHELE R. RICKERT
      rickert@whafh.com
19    BRITTANY N. DEJONG
      dejong@whafh.com
20    750 B Street, Suite 2770
      San Diego, CA 92101
21    Telephone:  619/239-4599
      Facsimile:  619/234-4599

22    **WOLF HALDENSTEIN ADLER**
23      **FREEMAN & HERZ LLP**
      JANINE L. POLLACK
24    pollack@whafh.com
      MICHAEL JAFFE
25    jaffe@whafh.com
      GLORIA KUI MELWANI
26    melwani@whafh.com
      270 Madison Avenue
27    New York, New York 10016
      Telephone:  212/545-4600

28                            - 49 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Facsimile:   212/545-4653

**ANDERSEN SLEATER LLC**
JESSICA J. SLEATER
jessica@andersensleater.com
1345 Avenue of the Americas
2nd Floor, Suite 2100
New York, New York 10105
Telephone: 212/878-3697

*Counsel for Plaintiffs Duane Robert Greene
Shawn Randall Thomas, James Hirtzel,
Anthony Swetala, and Dr. Sprague Simonds*

FIVEPAWNS:784281v1